# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ROSHUNDA ABNEY, an individual; ROSHUNDA ABNEY, as Personal Representative of the Estate of ANGEL DEWBERRY; and RAFFINEE DEWBERRY, an individual;<br><br>Plaintiffs,<br><br>vs.<br><br>UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA, a county hospital pursuant to NRS 450, et esq.; VALLEY HOSPITAL MEDICAL CENTER, INC., a Nevada corporation; DOE Defendants Abney through X, inclusive; and ROE CORPORATIONS, A through Z inclusive;<br><br>Defendants. | Case No.: 2:09-cv-02418-RLH-PAL<br><br>**O R D E R**<br><br>(Motion for Partial Summary Judgment–#6) |

Before the Court is Plaintiffs' **Motion for Partial Summary Judgment on Applicability of NRS 41A.035 and NRS 41.035 on Plaintiffs' Federal EMTALA Claims** (#6), filed December 24, 2009. The Court has also considered Defendant University Medical Center of Southern Nevada's ("UMC") Opposition (#12), filed January 11, 2010, and Plaintiffs' Reply (#21), filed January 15, 2010. Furthermore, the Court has considered Defendant Valley Hospital

1

AO 72
(Rev. 8/82)

Medical Center, Inc.'s ("Valley") Opposition (#22), filed January 18, 2010, and Plaintiffs' separate Reply (#23), filed January 23, 2010.

**BACKGROUND**

This case arises from a heart-wrenching story about a woman who miscarried her baby after waiting several hours for medical treatment in a hospital emergency room. Plaintiffs allege the following facts. On November 30, 2009, at approximately 5:25 pm, Plaintiff Roshunda Abney arrived at the UMC Quick Care located on Craig Road. Abney described her symptoms as severe abdominal pain lasting for two days and vaginal bleeding. After an initial evaluation, the Quick Care physician indicated that Abney needed to be transferred to UMC for "higher care."

At approximately 6:10 pm, Abney and her fiancé, Raffinee Dewberry, arrived at the UMC emergency room ("ER"). According to Plaintiffs, UMC personnel asked her if there was a chance she could be pregnant and she answered yes. When asked about her pain level, Abney indicated that she was in the worse pain of her life and added that she had experienced this pain for approximately two days. Dewberry attempted to shorten Abney's wait time by petitioning various UMC staff; however, UMC staff called security and made it clear that there was no certain time when Abney would be seen by a doctor. Meanwhile, Abney claims the pain continued to intensify, and witnesses in the waiting room reportedly volunteered to relinquish their position in line to help Abney obtain faster care.

Abney waited for medical treatment in the UMC ER for over five hours, during which time she claims the UMC nursing staff berated, belittled, and embarrassed both her and her fiancé. As a result of this perceived unwillingness to help, Abney and Dewberry left the UMC ER at approximately 11:45 pm. The couple then drove to Valley Hospital to obtain medical care for Abney. After telling Valley's staff that they were not seen at the UMC ER after a five-hour wait, a Valley representative allegedly responded by asking why they believed they would be seen any sooner at Valley than UMC. Believing Abney would not obtain medical care, the couple left Valley and returned to their home.

AO 72
(Rev. 8/82)

Once home, Abney showered in preparation to go to bed. At approximately 12:50 am, Abney's water broke while she was in the shower and she felt feet hanging from her vagina. Dewberry called 911 and followed the operator's instructions until the paramedics arrived and prepared Abney for delivery. The paramedics delivered the baby girl, Angel; however, she went into distress almost immediately. Although the paramedics immediately transported Abney and Angel back to UMC, Angel did not survive. Early that morning, December 1, 2009, a UMC nurse allegedly told the couple that Angel was born pre-viable, thus, nothing could have been done to save her. The couple contacted the Clark County Coroner's Office and requested an autopsy be performed. Plaintiffs claim the preliminary autopsy results indicate Angel's gestational age was 26 weeks (plus or minus three weeks), which could indicate that Angel was not born pre-viable.

On December 23, 2009, Plaintiffs filed suit in this Court. On January 11, 2010, Plaintiffs filed an Amended Complaint (#14) alleging: (1) violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA") for failure to screen and treat Abney (against UMC); (2) EMTALA violation for failure to screen and treat Angel (against UMC); (3) EMTALA violation for failure to screen and treat Abney (against Valley); (4) EMTALA violation for failure to screen and treat Angel (against Valley); (5) negligent infliction of emotional distress against Raffinee (against UMC); and (6) negligent infliction of emotional distress against Abney (against UMC).

On December 24, 2009, Plaintiffs filed this Motion for Partial Summary Judgment on the applicability of NRS 41A.035 (Nevada's medical malpractice award limitation) and NRS 41.035 (Nevada's limitation on tort awards against state entities) to Plaintiffs' Federal EMTALA claims (#6). In this motion, Plaintiffs only ask the Court to evaluate their disparate screen claims arising under EMTALA. For the reasons discussed below, the Court grants Plaintiffs' motion in part and denies it in part.

/

/

3

**DISCUSSION**

**I.     Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Bank of America v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002).

/

/

4

## II.     The Emergency Medical Treatment and Active Labor Act

Congress enacted EMTALA, 42 U.S.C. § 1395dd, as part of the Comprehensive Omnibus Budget Reconciliation Act of 1986 ("COBRA") to ensure that individuals receive adequate emergency medical care regardless of their ability to pay. *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001). "Congress was concerned that hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995). Nevertheless, EMTALA protects all individuals, not just those who are uninsured or indigent. *Arrington v. Wong*, 237 F.3d 1066, 1069–70 (9th Cir. 2001).

Under EMTALA, hospitals have two obligations. First, if a person seeks emergency care from a hospital that participates in the Medicare program, "the hospital must provide for an appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists." 42 U.S.C. § 1395dd(a). Second, if the hospital's medical staff determines that there is an emergency medical condition, then the staff must "stabilize" the patient before transferring or discharging him or her. 42 U.S.C. § 1395dd(b)(1). In this motion, Plaintiffs do not address their claims that Defendants failed to treat or stabilize Abney and Angel, thus, the Court will only address Defendants' first obligation.

### A.     Appropriate Medical Screening

EMTALA does not define the phrase "appropriate medical screening examination" other than to state that its purpose is to identify an "emergency medical condition." *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 879 (4th Cir. 1992); *del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 19 (1st Cir. 2002). However, the plain language of EMTALA requires a hospital "to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." *Baber*, 977 F.2d at 879. EMTALA is not a substitute for state law

/

5

malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence. *Id.* at 880.

Courts have interpreted EMTALA's appropriate medical screening to include a substantive and a procedural component. Substantively, a hospital must perform a screening that is reasonably calculated to uncover the existence of an emergency medical condition that may be afflicting symptomatic patients. *del Carmen*, 299 F.3d at 19 (quoting *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995)). Procedurally, a hospital must provide the same level of screening uniformly to all individuals who present substantially similar complaints—for example, uninsured persons must be given the same screening as insured persons. *Correa*, 69 F.3d at 1192 ("The essence of [the appropriate medical screening examination] requirement is that there be some screening procedure, and that it be administered even-handedly"). Likewise, the Ninth Circuit has held that a hospital satisfies the procedural component of EMTALA's appropriate medical screening requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not "designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Jackson*, 246 F.3d at 1256 (quoting *Eberhardt*, 62 F.3d at 1257). A hospital is not liable under EMTALA if it provides appropriate medical screening and, despite the screening, it negligently fails to uncover a patient's emergency medical condition. *Gardner v. Elmore Community Hosp.*, 64 F. Supp. 2d 1195, 1202 (M.D. Ala. 1999). *See also, Barris v. County of Los Angeles*, 972 P.2d 966 (Cal. 1999).

**B.    Enforcement Provisions for EMTALA Violations**

The enforcement provisions under EMTALA include both civil money penalties and private causes of action. Under the civil money penalties provision, negligent violations of EMTALA's requirements, by either a hospital, a physician, or both, are subject to money penalties not to exceed $50,000. 42 U.S.C. § 1395dd(d)(1)(A). EMTALA's provision for civil enforcement offers a private right of action for any individual who suffers personal harm as a direct result of a

hospital's violation to "obtain those damages available for personal injury under the law of the state in which the hospital is located...." *Id.* § 1395dd(d)(2)(A). By enacting this provision, Congress explicitly directed federal courts to look to state law in the state where the hospital is located to determine both the type and amount of damages available in EMTALA actions. *Power v. Arlington Hosp. Assoc.*, 42 F.3d 851, 860 (4th Cir. 1994).

### III.  Applicability of NRS 41A.035

Numerous federal courts have observed areas of overlap between federal and local causes of action arising out of the same facts. *See e.g., del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15, 21 (1st Cir. 2002); *Romar v. Fresno Comty Hosp.*, 583 F. Supp. 2d 1179, 1186 (E.D. Cal. 2008); *Jackson v. E. Bay Hosp.,* 980 F. Supp. 1341, 1349 (N.D. Cal. 1997), *aff'd on other grounds*, 246 F.3d 1248 (9th Cir. 2001). Additional causes of action under EMTALA frequently arise out of the same facts as a medical malpractice cause of action including battery, products liability, premises liability, fraud, breach of contract, and intentional or negligent infliction of emotional distress. *Smith v. Ben Bennett, Inc.*, 35 Cal. Rptr. 3d 612, 615 (Cal. Ct. App. 2005). Similarly, federal courts have found it possible for a screening to violate EMTALA, but not state medical malpractice law, and vice versa. *Romar*, 583 F. Supp. 2d at 1186 (citing *Jones v. Wake County Hosp. System, Inc.*, 786 F. Supp. 538, 545 (E.D.N.C. 1991). Therefore, to determine whether Nevada's medical malpractice cap applies, the Court must examine NRS 41A.035, the underlying conduct Plaintiffs challenge in their EMTALA claim and its legal basis, and then decide whether the conduct would give rise to a medical malpractice claim under Nevada law. *See Power*, 42 F.3d at 860.

#### 1.  NRS 41A.035 - Nevada's Medical Malpractice Cap

In 2004, Nevada voters passed the ballot initiative that became NRS 41A.035, a medical malpractice award limit or cap sometimes referred to as Nevada's "tort reform" statute. Under NRS 41A.035, an injured plaintiff may recover noneconomic damages in a tort action "based upon professional negligence" against a "provider of health care," but the amount of

noneconomic damages cannot exceed $350,000. A "provider of health care" includes physicians, licensed nurses, licensed hospitals and their employees. NRS 41A.017. Under NRS 41A.015, "professional negligence" includes:

> a negligent act or omission to act by a provider of health care in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death. The term does not include services that are outside the scope of services for which the provider of health care is licensed or services for which any restriction has been imposed by the applicable regulatory board or health care facility.

Although the Court does not have the benefit of legislative history specific to NRS 41A.035, many states have passed similar medical malpractice award caps in order to reduce medical malpractice insurance premiums, stabilize the availability of malpractice insurance, retain doctors, and insure the ongoing availability of quality medical care within the state. The type of damage cap and corresponding award limit varies from state to state: non-economic damages (such as Nevada), *see, e.g.*, Mo. Ann. Stat. § 538.210 (West 2009), Wis. Stat. Ann. § 893.55 (West 2006); general and punitive damages, *see, e.g.*, Fla. Stat. Ann. §§ 766.118, 768.73 (West 2009); and all damages except for medical care and related expenses, *see, e.g.*, Va. Code Ann. §§ 8.01-38.01, 8.01-581.15 (West 2009).

Because each state legislature has tailored its medical malpractice awards cap according to the individual state's needs, the Court cannot assume that a particular district or circuit court's decision on this issue is persuasive or even relevant. Rather the Court must examine the type of medical malpractice cap at issue in the various court decisions to ensure a correct analysis. One statute with a non-economic damage cap similar to Nevada's NRS 41A.035 is California's 1975 Medical Injury Compensation Reform Act ("MICRA"), Cal. Civ. Code § 3333.2 (West 2009), which limits noneconomic damage awards in professional negligence actions against health care providers to $250,000. California state courts have found the same conduct can form the basis of a MICRA and non-MICRA applicable claim against a health care provider. *See e.g., Smith*, 35 Cal. Rptr. 3d at 615 (finding that a MICRA tolling provision did not apply to an

AO 72
(Rev. 8/82)

elder abuse claim); *Waters v. Bourhis*, 709 P.2d 469 (Cal. 1985) (finding that MICRA applied to a professional negligence claim but not an intentional tort claim when a psychiatrist allegedly engaged in sexual misconduct with the plaintiff). Although the California Supreme Court did find that an EMTALA failure-to-stabilize claim in an action against a health care provider based on professional negligence constituted an action subject to MICRA's damages limitations, the court specifically expressed no opinion on whether a medical screening claim would be subject to MICRA. *Barris v. County of Los Angeles*, 972 P.2d 966, 972 n.4 (Cal. 1999). Nevertheless, federal district courts in the Eastern District and Northern District of California have held that screening claims under EMTALA are not bound by MICRA's cap. *Romar*, 583 F. Supp. 2d at 1186; *Jackson,* 980 F. Supp. at 1349.

The Court finds the *Romar* and *Jackson* courts' rationale persuasive. The *Jackson* court opined:

> Although the harm suffered as a result of the hospital's failure to meet EMTALA's statutory requirements may also permit the plaintiff to maintain a negligence claim, this court cannot go so far as to restrict plaintiff's recovery of damages for her EMTALA claims by applying California's MICRA damages cap which explicitly is limited to claims "based on professional negligence."

980 F. Supp. at 1350. The *Romar* court similarly held: "Although a medical screening may be a service provided by a hospital, the provision of a screening is not governed by the standards of knowledge, care, and skill of members of the medical profession...." 583 F. Supp. 2d at 1189. Defendants urge the Court to follow the Fourth Circuit's decision in *Power* where the court found that Virginia's medical malpractice cap applied to the plaintiff's EMTALA screening claim. However, the Virginia statute at issue in *Power* is distinguishable from both MICRA and NRS 41A.035. *See Jackson,* 980 F. Supp. at 1350 (analyzing *Power*, 42 F.3d at 861) ("In deciding whether the Virginia Medical Malpractice Act limited the recovery of damages under EMTALA, the *Power* court specifically pointed out that the Virginia statute was applicable to "*any tort* based on health care or professional services rendered." (emphasis added)). Because nothing in NRS

/

9

41A.035 indicates that its damages limitation extends to *all torts*—which would vastly expand the statutory definition of "professional negligence," the Court declines to follow *Powers*.

The Court finds that there is indeed a difference between a state law claim for medical malpractice based on professional negligence, to which NRS 41A.035 applies, and an EMTALA screening claim, to which NRS 41A.035 may or may not apply.  EMTALA causes of action provide "distinct remedies for distinct wrongs." *Cooper v. Gulf Breeze Hosp., Inc.*, 839 F. Supp. 1538, 1543 (N.D. Fla. 1993) (holding Florida damages limitation provision inapplicable to an EMTALA claim).  Plaintiffs do not dispute that their EMTALA claims for failure to treat fall under the rubric of medical malpractice.  (*See* #6, Mtn. 3:26–4:4.)  Instead, they have repeatedly asked the Court to focus on the applicability of NRS 41A.035 to Plaintiffs' screening claims under EMTALA.  Thus, the Court must analyze the underlying conduct in Plaintiffs' allegations to determine whether the NRS 41A.035 damages cap applies.

### 2.   The Underlying Conduct and Legal Basis

The underlying conduct at issue in this motion is Defendants' alleged disparate screening of Abney.  To recover on an EMTALA disparate screening claim, a plaintiff must set forth evidence sufficient to support a finding that he "received a materially different screening than that provided to others in his condition.  It is not enough to proffer expert testimony as to what treatment *should* have been provided to a patient in [the plaintiff's] position." *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 84 (1st Cir. 2000).  Moreover, "[e]vidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment." *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 994 (9th Cir. 2001) (quoting *Battle v. Mem. Hosp.*, 228 F.3d 544, 558 (5th Cir. 2000) (noting that a hospital's liability under EMTALA is "not based on whether the physician misdiagnosed the medical condition or failed to adhere to the appropriate standard of care")).  Negligence in the screening process or providing a faulty screening or making a misdiagnosis, as opposed to refusing to screen or providing disparate screening, does not violate EMTALA, although it may violate state malpractice law. *See Marshall*

*v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998) (citing *Eberhardt*, 62 F.3d at 1258).

The Court finds that the underlying conduct Plaintiffs describe supports a disparate screening claim, which is not based on professional negligence or subject to NRS 41A.035. Contrary to UMC's assertion in its Opposition (#12, 9:19–25), Plaintiffs do allege that the underlying conduct constituted disparate treatment: Abney requested an examination; UMC has (or should have) a policy providing for an appropriate medical screening examination; UMC did not provide such an examination; thus, UMC failed to treat Abney the same as they have treated others with similar symptoms. (#18, Am. Compl. ¶ 115–18.)  Rather than argue that NRS 41A.035 applies to disparate screening claims, Defendants merely assert that Plaintiffs' claims are based on professional negligence and that Plaintiffs failed to allege disparate screening.  Neither supposition is correct.  Because disparate screening claims under EMTALA are not based on underlying conduct or legal theory amounting to professional negligence, NRS 41A.035 does not apply.  The Court notes, however, that this finding is limited to Plaintiffs' disparate screening claim and does not extend to any cursory or faulty screening claim to which NRS 41A.035 may or may not apply.

**III.  Applicability of NRS 41.035**

Plaintiffs also ask the Court to determine whether NRS 41.035 applies to their claims against UMC.  Under NRS 41.035, an award for damages in a tort action brought against a state actor "arising out of an act or omission within the scope of his public duties or employment may not exceed the sum of $75,000.... An award may not include any amount as exemplary or punitive damages."  Plaintiffs do not dispute that UMC is a state actor.  Instead, they ask the Court to declare NRS 41.035 inapplicable to their EMTALA claims.

Plaintiffs assert NRS 41.035 should not be applied to their claims because this action is based upon alleged violations of EMTALA, a federal statute that provides a private right of action independent of any state tort law.  They cite an Eighth Circuit case, *Root v. New Liberty*

11

1   *Hospital District*, to support their assertion. 209 F.3d 1068 (8th Cir. 2000). In *Root*, the Eighth
2   Circuit held that EMTALA preempted a Missouri sovereign immunity statute, which would have
3   precluded a hospital's EMTALA liability, because the federal and state laws were in direct
4   conflict. *Id.* at 1070. Plaintiffs contend that the application of NRS 41.035 to their claims would
5   amount to a partial sovereign immunity, which—like the Missouri sovereign immunity
6   statute—would conflict with EMTALA. The Court disagrees. Such a reading of NRS 41.035
7   ignores EMTALA's plain language that allows for "those damages available for personal injury
8   under the law of the state in which the hospital is located...." 42 U.S.C. § 1395dd(d)(2)(A).

9         Nevada's NRS 41.035, which limits damage awards against state actors, is
10  distinguishable from Missouri's statute providing complete sovereign immunity. Plaintiffs are not
11  precluded from recovering on an EMTALA claim under NRS 41.035, rather they are limited to a
12  fixed statutory amount. Federal statutes only override state law "when state law is in actual
13  conflict with federal law." *Qwest Corp. v. Arizona Corp. Comm'n*, 567 F.3d 1109, 1118 (9th Cir.
14  2009) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). "This so-called conflict
15  preemption is found 'where state law stands as an obstacle to the accomplishment and execution of
16  the full purposes and objectives of Congress.'" *Id.* The Court finds that NRS 41.035 is not in
17  actual conflict with EMTALA because it does not obstruct Congressional intent to establish a
18  private right of action for an EMTALA violation. Thus, EMTALA does not preempt the
19  application of NRS 41.035 to Plaintiffs' claims. Accordingly, the Court concludes that NRS
20  41.035 applies to Plaintiffs' claims against UMC.
21  /
22  /
23  /
24  /
25  /
26  /

12

AO 72
(Rev. 8/82)

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Partial Summary Judgment (#6) is GRANTED in part and DENIED in part as follows. The NRS 41A.035 medical malpractice damages limitation does not apply to Plaintiffs' EMTALA disparate screening claims. However, the NRS 41.035 damages cap limiting tort awards against state actors applies to Plaintiffs claims against Defendant UMC.

Dated: April 8, 2010.

_____
ROGER L. HUNT
Chief United States District Judge